IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

KENNETH GUINN,                         )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )      Civ. No. 14-1416-LPS
                                       )
CAROLYN COLVIN,                        )
ACTING COMMISSIONER OF                 )
SOCIAL SECURITY,                       )
                                       )
            Defendant.                 )

---

Stephen A. Hampton, GRADY & HAMPTON, LLC, Dover, DE.

      Attorney for Plaintiff.


Charles M. Oberly, III, United States Attorney, and Heather Benderson, Special Assistant United States Attorney, OFFICE OF THE GENERAL COUNSEL, Philadelphia, PA.

Nora Koch, Acting Regional Chief Counsel, and Timothy Reiley, Assistant Regional Counsel, SOCIAL SECURITY ADMINISTRATION, Philadelphia, PA.

      Attorneys for Defendant.


## MEMORANDUM OPINION


March 21, 2016
Wilmington, Delaware

**STARK, U.S. District Judge:**

## I.   INTRODUCTION[1]

Plaintiff Kenneth Guinn ("Guinn" or "Plaintiff") appeals from decisions of Carolyn W. Colvin, the Acting Commissioner of the Social Security Administration ("the Commissioner" or "Defendant"), denying his claims for disability insurance benefits ("DIB" or "DIBs") under Title XVI, 42 U.S.C. §§ 1381-83 ("Title XVI"), of the Social Security Act.  The Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  Before the Court are cross-motions for summary judgment filed by Plaintiff and the Commissioner.  (D.I. 14, 16)

Plaintiff asks for remand and further proceedings before the Commissioner with respect to his request for DIBs from January 19, 2010 through May 30, 2013.  (D.I. 15 at 1)  The Commissioner requests that the Court affirm the decision denying Plaintiff's application for benefits.  (D.I. 17 at 1-2)  For the reasons set forth below, the Court will deny Plaintiff's motion for summary judgment and grant Defendant's motion for summary judgment.

## II.   BACKGROUND

### A.   Procedural History

On January 19, 2010, Plaintiff filed a Title XVI application for supplemental social security income ("SSI").  (D.I. 10 ("Tr.") at 53)  On September 29, 2010, Plaintiff's application was denied at the initial level of administrative review.  (*Id.* at 102)  On January 19, 2011, Plaintiff's application was denied on reconsideration.  (*Id.* at 107)  Plaintiff's case was dismissed on March 7, 2012, after Plaintiff failed to appear for a scheduled hearing (*id.* at 97), but the

---

[1]Unless otherwise indicated, all facts are taken from supporting briefs submitted by the parties and case record.

1

Appeals Council vacated the dismissal after Plaintiff explained that he had not been able to

appear at the hearing as a result of incarceration (*id.* at 99-100).  After a hearing before an

Administrative Law Judge ("ALJ") on May 9, 2013, the ALJ issued a decision on May 30, 2013,

finding Plaintiff not to be under a disability within the meaning of the Social Security Act

("SSA") because his alleged conditions were not severe enough to prevent employment.  (*Id.* at

21, 25)  Plaintiff filed a request for review of the hearing decision and order, which was denied.

(*Id.* at 1)  Thus, the May 30, 2013 decision of the ALJ became the Commissioner's final

decision.  (*See id.*)

On November 18, 2014, Plaintiff filed suit here, seeking judicial review of the

Commissioner's denial of benefits.  (D.I. 1)  The parties completed briefing on their cross-

motions for summary judgment on September 21, 2015.  (*See* D.I. 15, 17, 19)

### B.    Factual History

#### 1.    Plaintiff's Testimony

Plaintiff testified before an ALJ on May 9, 2013, in support of his petition for benefits.

(*See* Tr. at 32-52)  His testimony established that he had an 11th grade education and once

worked as a laborer at a temporary agency.  (*Id.* at 38-39)  (Testimony from a vocational expert

("VE") revealed more specifically that Plaintiff had previously worked as a retail clerk and fast

food worker.  (*Id.* at 48))  Plaintiff reported inability to work due to carpal tunnel syndrome,

arthritis, depression, and attention deficit hyperactivity disorder ("ADHD").  (*Id.* at 39-40)  He

stated that his ADHD was alleviated by medicine but that splints did not help his carpel tunnel.

(*Id.* at 41-42)  He claimed an inability to hold a broom while standing or to sit, stand, or walk for

more than five minutes, and he believed he was unable to lift more than ten pounds.  (*Id.* at 42,

45)  He further reported daily living activities of attending appointments and speaking to others about his ADHD.  (*Id.* at 46-47)  When questioned by the ALJ about his reason for not working since 2005, Plaintiff explained that he was off-task due to his ADHD.  (*Id.* 41)

### 2.   Ms. Pan, PA-C

Plaintiff began seeing Zhen Pan, PA-C, in September 2009 for moderate right ankle and elbow pain after slipping and falling inside a liquor store.  (*Id.* at 320, 397)  An x-ray showed no ankle fracture (*id.* at 320, 326), and Plaintiff's condition improved and progressed as expected over the following month (*id.* at 320, 322, 326), leading to unremarkable ankle and elbow x-rays in October (*id.* at 327-28).  On December 10, 2009, Ms. Pan noted some tenderness in Plaintiff's ankle despite continued improvement, but found no musculoskeletal swelling or deformity.  (*Id.* at 324-25)

Throughout 2010 and 2011, Plaintiff continued to see Ms. Pan for various conditions, including carpal tunnel, for which he reported receiving treatment since 2005.  (*See, e.g.*, *id.* at 388)  During this period, Ms. Pan repeatedly found no clubbing, cyanosis, or peripheral edema in Plaintiff's extremities.  (*Id.* at 382, 421, 425, 432, 456-57)  In the summer of 2010, Ms. Pan found no musculoskeletal swelling or deformity; however, Plaintiff complained of right second- and third-finger numbness and wrist pain, stating that he could not twist a can lid but that a wrist splint helped somewhat.  (*Id.* at 53, 387)  He obtained a note from Ms. Pan about his back pain after being pulled over for not wearing a seat belt.  (*Id.* at 420-21)

In November 2010, Plaintiff reported swelling of his left thumb, several months after pulling weeds, and although an x-ray showed no fracture or dislocation and unremarkable alignment, Ms. Pan found swelling, tenderness, and decreased range of motion at Plaintiff's

3

metacarpophalangeal thumb joint, and she diagnosed him with thumb pain which was progressing as expected. (*Id.* at 422-23)  The following month, Ms. Pan found no swelling or deformity and that Plaintiff's musculoskeletal range of motion was within normal limits. (*Id.* at 425)  Two weeks later, an MRI showed moderate osteoarthritis in Plaintiff's left hand, with a mild deformity in Plaintiff's metatarsophalangeal joint, likely correlated with a prior healed trauma. (*Id.* at 444)  In February 2011, Plaintiff reported that his thumb still hurt, and Ms. Pan noted the mild deformity that had been found in his metatarsophalangeal joint but no tenderness or swelling. (*Id.* at 430)  A week later, Plaintiff denied any joint pain. (*Id.* at 432)

### 3.    Dr. David Nixon

For his ADHD, Plaintiff began seeing Dr. Nixon at Phoenix Mental Health of Dover in 2005, being prescribed Wellbutrin and Adderall. (*See id.* at 361-64)  During the two years following his application for DIBs, Dr. Nixon diagnosed Plaintiff with ADHD as well as depressive disorder, not elsewhere classified, and assessed him global assessment of functioning ("GAF") scores[2] of between 60 and 75. (*Id.* at 329, 372-73, 413-17, 470-74)  Dr. Nixon's mental status examinations were consistently within normal limits, reflecting no suicidal or homicidal ideation. (*Id.*)

### 4.    Residual Functional Capacity ("RFC") Assessments

On August 12, 2010, Plaintiff saw Dr. Ayoola for a consultative examination and

---

[2]GAF scores of 51-60 indicate moderate symptoms or moderate difficulty in social, occupation, or school functioning; GAF scores of 61-70 indicate mild symptoms or some difficulty in social, occupation, or school functioning, but otherwise generally functioning well with some meaningful interpersonal relationships; and GAF scores of 71-80 indicate transient or no symptoms and expected reactions to psychosocial stressors, with at most slight impairments in social, occupational, or school functioning. *See DSM-IV* at 34.

complained of pain and tingling in his right side, stating he could not tie his shoelaces or sit for extended periods of time. (*Id*. at 388-91) Dr. Ayoola's only remarkable findings were marginally reduced range of motion in Plaintiff's spine and a little reduction in shoulder elevation. (*Id*. at 389-90) He found Plaintiff's hand grip to be strong on both sides and that Plaintiff could write, albeit clumsily. (*Id*. at 390) Dr. Ayoola diagnosed Plaintiff with a history of bilateral carpal tunnel syndrome, histories of depression and ADHD, and a history of glaucoma. (*Id*. at 390) In his conclusions, Dr. Ayoola stated:

> I believe that his dexterity is intact on both ends and that his declining to tie his shoelaces was questionable. . . . [I]t is possible that [Plaintiff] has some low back pain due to vertebral degenerative disease. . . . Given the historical data and the results of my physical examination, I am unable to find any significant obstacle to being able to work from the standpoint of physical restriction. . . . The present assessment does not find any physical obstacle to being able to work for 30 to 40 hours per week from the medical standpoint.

(*Id*. at 391)

On September 20, 2010, Dr. Janis Chester conducted a consultative examination of Plaintiff, who reported being "somewhat irritable" despite denying depression. (*Id*. at 391-99) Dr. Chester found that Plaintiff was difficult to engage due to a tangential and perseverative thought process, that his immediate memory was intact, his short-term memory was initially not intact but improved with prompting, his long-term memory was fair, and his insight and judgment were fair. (*Id*. at 398) Dr. Chester diagnosed Plaintiff with ADHD and provisionally diagnosed him with malingering and side effects of his medication, assessing him a GAF score of 55. (*Id*. at 399) In her RFC assessment, Dr. Chester concluded that Plaintiff experienced no limitations with respect to performing repetitive and varied tasks; mild limitations with respect to

5

daily living activities, work involving minimal contact with others, and performing simple tasks; moderate limitations with respect to dealing with people or performing complex tasks; and moderately severe limitations with respect to comprehending or following instructions and work involving frequent contact with people. (*Id.* at 392)

On September 22, 2010, state-agency expert physician Dr. Tom Dees agreed with Dr. Ayoola's conclusion about the absence of any physical obstacles to full-time work from a medical standpoint. (*Id.* at 400)

On September 25, 2010, state-agency expert psychologist Dr. Alvin Smith confirmed Dr. Chester's diagnoses of ADHD and depression, not otherwise specified. (*Id.* at 402, 404) Based on his findings that Plaintiff was only mildly restricted in his daily living activities, social functioning, concentration, persistence, and pace, Dr. Smith concluded that Plaintiff was not severely mentally impaired. (*Id.* at 401, 409, 411)

On January 10, 2011, state-agency expert psychiatrists Drs. Aroon Suansilppongse and Anne Aldridge also agreed with Dr. Chester's opinions, finding no evidence of a significant thought disorder or cognitive defects. (*Id.* at 418-19) Dr. Suansilppongse further observed that Plaintiff's conditions were self-limited and improved with treatment. (*Id.* at 418)

### 6.    The ALJ's Findings

Plaintiff appeals the ALJ's May 30, 2013 decision, which contained the following findings:

1.    The claimant has not engaged in substantial gainful activity since January 19, 2010, the alleged onset date (20 CFR 416.971 *et seq.*).

2.    The claimant has the following severe impairments: history of back disorder, history of carpal tunnel syndrome, arthritis in the hands,

6

attention-deficit hyperactivity disorder and depression (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (416.920(d), and 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(a) except can lift ten pounds frequently and twenty pounds occasionally; requires the ability to sit/stand consistently on an alternate basis at will; must avoid heights and hazardous machinery, temperature extremes, ladders, ropes and other like devices; mildly limited in the upper extremities in the ability to push/pull and can do very little tasks requiring dexterity and manipulation.  Additionally, the claimant is limited to simple, routine, unskilled jobs with a specific vocational preparation of one to two in nature; limited to low stress jobs with little concentration and memory requirements and only one to two step tasks, no production rate work and no changes in the work setting or decision-making requirements.

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant was born on December 1, 1963 and was 46 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education and is able to communicate English (20 CFR 416.964)

8. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, from January 19, 2010, the date the application was filed (20 CFR 416.920(g)).

(*Id*. at 18-25)

## III.    LEGAL STANDARDS

### A.    Motion for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a).  In determining the appropriateness of summary judgment, the Court must

"review the record taken as a whole . . . draw[ing] all reasonable inferences in favor of the

nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves*

*v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (internal quotation marks

omitted).  If the Court is able to determine that there is no genuine dispute as to any material fact

and that the movant is entitled to judgment as a matter of law, summary judgment is appropriate.

*See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005).

### B.    Review of the ALJ's Findings

The Court must uphold the Commissioner's factual decisions if they are supported by

"substantial evidence."  *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Monsour Med. Ctr. v.*

*Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986).  "Substantial evidence" means less than a

preponderance of the evidence but more than a mere scintilla of evidence.  *See Rutherford v.*

*Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005).  As the United States Supreme Court has noted,

substantial evidence "does not mean a large or significant amount of evidence, but rather such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the

Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh

the evidence of record. *See Monsour*, 806 F.2d at 1190-91. The Court's review is limited to the

evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95

(3d Cir. 2001). However, evidence that was not submitted to the ALJ can be considered by the

Appeals Council or the District Court as a basis for remanding the matter to the Commissioner

for further proceedings, pursuant to the sixth sentence of 42 U.S.C. § 405(g). *See Matthews*, 239

F.3d at 592. "Credibility determinations are the province of the ALJ and only should be

disturbed on review if not supported by substantial evidence." *Gonzalez v. Astrue*, 537 F. Supp.

2d 644, 657 (D. Del. 2008) (internal quotation marks omitted).

The Third Circuit has explained that a "single piece of evidence will not satisfy the

substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by

countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence,

particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really

constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.

1983). Thus, the inquiry is not whether the Court would have made the same determination but,

rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d

1211, 1213 (3d Cir. 1983). Even if the reviewing Court would have decided the case differently,

it must give deference to the ALJ and affirm the Commissioner's decision if it is supported by

substantial evidence. *See Monsour*, 239 F.3d at 1190-91.

## IV.    DISCUSSION

### A.    Disability Determination Process

Title XVI of the Social Security Act provides for the payment of disability benefits to

9

indigent persons under the SSI program. *See* 42 U.S.C. § 1382(a). A "disability" is defined for

purposes of SSI as the inability "to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than 12 months.

*See* 42 U.S.C. § 1382c(a)(3). A claimant is disabled "only if his physical or mental impairment

or impairments are of such severity that he is not only unable to do his previous work but cannot,

considering his age, education, and work experience, engage in any other kind of substantial

gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(l)(B); *see also*

*Barnhart v. Thomas*, 540 U.S. 20, 21-23 (2003).

 In determining whether a person is disabled, the Commissioner is required to perform a

five-step sequential analysis. *See* 20 CFR § 416.920; *Russo v. Astrue*, 421 F. App'x 184, 188 (3d

Cir. 2011). If a finding of disability or non-disability can be made at any point in the sequential

process, the Commissioner will not review the claim further. *See* 20 C.F.R. § 416.920(a)(4).

 At step one, the Commissioner must determine whether the claimant is engaged in any

substantial gainful activity. *See* 20 C.F.R. § 416.920(a)(4)(i) (mandating finding of

non-disability when claimant is engaged in substantial gainful activity). If the claimant is not

engaged in substantial gainful activity, step two requires the Commissioner to determine whether

the claimant is suffering from a severe impairment or a combination of impairments that is

severe. *See* 20 CFR § 416.920(a)(4)(ii) (mandating finding of non-disability when claimant's

impairments are not severe). If the claimant's impairments are severe, the Commissioner, at step

three, compares the claimant's impairments to a list of impairments that are presumed severe

enough to preclude any gainful work. *See* 20 C.F.R. § 416.920(a)(4)(iii). When a claimant's

impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See id.* If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. § 416.920(e).

At step four, the Commissioner determines whether the claimant retains the RFC to perform her past relevant work. *See* 20 C.F.R. § 416.920(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work). A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999) (internal citation omitted). If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. *See* 20 C.F.R. § 416.920(a)(4)(v) (mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with [her] medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a VE. *See id.*

### B.    Arguments on Appeal

Plaintiff contends that the ALJ (1) "failed to meet her burden of proving the existence of

a significant number of jobs in the national economy that Plaintiff can perform" and (2) "failed to

properly weigh all of the relevant medical evidence, and mischaracterized, misinterpreted, or

misunderstood the consultative examiner's findings regarding Plaintiff's disabling mental

impairments." (D.I. 15 at 2)  In response, the Commissioner argues that the ALJ's findings were

supported by substantial evidence, and the decision should be affirmed. (*See* D.I. 17 at 2)  The

Court addresses each of these disputes below.

### 1.    Existence of a Significant Number of Jobs in the National Economy that Plaintiff Could Perform

In assessing Guinn's RFC, the ALJ limited Guinn to jobs requiring "very little tasks

requiring dexterity and manipulation," as well as "one to two step tasks." (*Id.* at 21, 49)  Plaintiff

argues that the jobs identified by the VE – night patrol inspector, office helper, and ticket

taker/usher (Tr. at 49-50) – do not meet these two functional limitations.  Specifically, Plaintiff

argues that all three jobs require frequent handling, that the first two require frequent fingering,

and that all three require a reasoning level of 2.

The Dictionary of Occupational Titles ("DOT") defines the job of night patrol inspector

as follows:

> Patrols scheduled route to inspect operation of illuminated and
> animated signs: Drives company car along scheduled route at
> night.  Inspects signs covered by company maintenance contract
> for specified appearance and operation.  Reports faulty operation to
> service department.  May perform minor repairs, such as replacing
> light bulbs.

DICOT 824.683-010 Night-Patrol Inspector, 1991 WL 681741.  The DOT defines the job of

ticket taker as follows:

> Collects admission tickets and passes from patrons at
> entertainment events: Examines ticket or pass to verify
> authenticity, using criteria such as color and date issued. Refuses
> admittance to patrons without ticket or pass, or who are
> undesirable for reasons, such as intoxication or improper attire.
> May direct patrons to their seats.  May distribute door checks to
> patrons temporarily leaving establishment. . . .

DICOT 344.667-010 Ticket Taker, 1991 WL 672863.  Lastly, the DOT defines the job of office

helper as follows:

> Performs any combination of following duties in business office of
> commercial or industrial establishment: Furnishes workers with
> clerical supplies.  Opens, sorts, and distributes incoming mail, and
> collects, seals, and stamps outgoing mail.  Delivers oral or written
> messages.  Collects and distributes paperwork, such as records or
> timecards, from one department to another.  Marks, tabulates, and
> files articles and records.  May use office equipment, such as
> envelope-sealing machine, letter opener, record shaver, stamping
> machine, and transcribing machine. . . .

DICOT 239.567-010 Office Helper, 1991 WL 672232.

The VE testified that all three of these jobs meet all of the functional limitations

identified by the ALJ.  (*See* Tr. at 48-50)  Any inconsistencies between a VE's testimony and the

DOT do not automatically "mandate remand, so long as 'substantial evidence exists in other

portions of the record that can form an appropriate basis to support the result.'"  *Zirnsak v.

Colvin*, 777 F.3d 607, 617 (3d Cir. 2014) (quoting *Rutherford*, 399 F.3d at 557).

The Court agrees with Plaintiff that the job of office helper does not fit within the

limitations set by the ALJ, as this job requires a "medium degree of aptitude ability," equivalent

to the middle third of the population, for both finger dexterity and manual dexterity.  *See* DICOT

239.567-010 Office Helper, 1991 WL 672232.  Accordingly, the Court does not consider the

position of office helper in assessing whether the Commissioner proved there are a significant number of jobs in the national economy that Plaintiff can perform.

However, the Court need not remand on this basis if the other two options identified by the VE satisfy the requirement of a significant number of jobs in the national economy that could be performed by Plaintiff. *See generally Craigie v. Bowen*, 835 F.2d 56, 58 (3d Cir. 1987) (explaining that 200 jobs in region is "clear indication" of substantial gainful employment opportunities nationwide).

The other two jobs identified by the VE require only a "low degree of aptitude ability" for finger dexterity and manual dexterity, equivalent to the lowest third of the population excluding the bottom 10%. *See* DICOT 824.683-010 Night-Patrol Inspector, 1991 WL 681741; DICOT 344.667-010 Ticket Taker, 1991 WL 672863. Plaintiff does not explain why he believes the jobs of night patrol inspector and ticket taker are inconsistent with "very little tasks requiring dexterity and manipulation," and the Court does not perceive any such inconsistency. Indeed, with respect to ticket taker, Plaintiff concedes in his Reply Brief that this job does not require frequent fingering (*see* D.I. 19 at 1), and the DOT does not indicate that collecting and examining admission tickets necessarily requires frequent manipulation, *see* DICOT 344.667-010 Ticket Taker, 1991 WL 672863. With respect to the night patrol inspector, aside from the occasional light bulb change or other minor repair which is commensurate with "manipulation on an occasional basis," this job appears to require use of hands only for driving, *see* DICOT 824.683-010 Night-Patrol Inspector, 1991 WL 681741, which the ALJ noted is one of Plaintiff's daily living activities (*see* Tr. at 19; *see also id.* at 23, 245-50).

Next, Plaintiff argues that all the jobs identified by the VE require a reasoning level of 2,

14

but the ALJ limited him to "simple, routine, unskilled jobs with a specific vocational preparation

of one to two in nature; limited to low stress jobs with little concentration, *one or two step tasks*,

no production rate work and no changes in the work setting or decision-making requirements,"

which Plaintiff believes to be equivalent to a reasoning level of 1. (Tr. at 21 (emphasis added);

*see also id.* at 49 ("jobs that are low stress in nature, concentration and memory and that – by that

I mean *one or two step jobs, one or two step tasks,* no production rate work, jobs that have little

judgment or changes in the work setting or decisions to, to perform the work") (emphasis added))

A reasoning level of 2 requires the ability to "[a]pply commonsense understanding to carry out

detailed but uninvolved written or oral instructions" and "[d]eal with problems involving a few

concrete variables in or from standardized situations." DICOT 824.683-010 Night-Patrol

Inspector, 1991 WL 681741. Plaintiff contends that this is inconsistent with the functional

limitation of "one or two step tasks" because "one or two step tasks" typically corresponds with a

reasoning level of 1. *See, e.g.,* DICOT 575.685-050 Lead Former, 1991 WL 684069

("Reasoning: Level 1 - Apply commonsense understanding to carry out simple one- or two-step

instructions. Deal with standardized situations with occasional or no variables in or from these

situations encountered on the job."). The Court disagrees.

Here, as in *Thompson v. Astrue,* "[t]he ALJ's inclusion of the words 'one- to two-step

tasks' in [his] RFC limitations did not limit Plaintiff to jobs with a reasoning level of 1. Courts

in other districts have held that these words are not inconsistent with a reasoning level of 2."

2009 WL 7007996, at *12 (E.D. Pa. Jan. 30, 2009) (citing cases), *adopted by* 2010 WL 4159154

(E.D. Pa. Oct. 22, 2010). Rather, "[a]ppl[ying] commonsense understanding to carry out detailed

but uninvolved written or oral instructions," such as patrolling a scheduled route or checking

admission tickets, and "[d]eal[ing] with problems involving a few concrete variables in or from standardized situations," such as changing a lightbulb or directing patrons to their seats, are not necessarily inconsistent with the ALJ's limitation of "one or two step tasks." Indeed, considering the record as a whole, as did the ALJ, Plaintiff retained the ability to conduct daily living tasks such as driving to appointments, buying groceries, and cleaning his house. (*See* Tr. at 20, 245-46) Because there is substantial evidence to support the ALJ's conclusion that Plaintiff could perform the jobs of night patrol inspector and ticket taker, the Court concludes that there are a significant number of jobs in the national economy that Plaintiff could perform.

## 2.    Dr. Chester's Report

"Because non-examining state agency medical and psychological consultants are 'highly qualified' physicians and psychologists and 'experts in the evaluation of the medical issues in disability claims under the Social Security Act (the 'Act'),' their opinions on [a] claimant's residual functional capacity are entitled to weight." *Jopson v. Astrue*, 517 F. Supp. 2d 689, 702 (D. Del. 2007) (citing 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i)); *see also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("[S]tate agency opinions merit significant consideration."); *Coleman v. Comm'r of Soc. Sec.*, 494 F. App'x 252, 254 (3d Cir. 2012). Here, the ALJ expressly gave "considerable weight" to Dr. Chester's report (*see* Tr. at 23), which, among other things, provisionally diagnosed by Dr. Chester with malingering (*see id.* at 399).

Plaintiff contends that the ALJ failed to include in his RFC analysis – or otherwise explain his reasons for rejecting – certain functional limitations identified by Dr. Chester, namely moderate limitations in ability to relate to other people and to perform complex tasks, and

16

moderately severe limitations in comprehending and following instructions and performing work requiring frequent contact with others. (*See id.* at 392)  These limitations were explicitly noted in the ALJ's explanation of his RFC.[3]  (*Id.* at 23)  With respect to moderate limitations in carrying out complex tasks and moderately severe limitations in comprehending and following instructions, the ALJ reasonably accounted for these limitations by including in his RFC the limitations of routine, unskilled, low-stress jobs requiring little concentration and memory, only "one to two step tasks," no production rate work, and a specific vocational preparation ("SVP") of 1 or 2.  (*Id.* at 21)  With respect to moderate limitations in ability to relate to others and moderately severe limitations in performing work requiring frequent contact with others, the ALJ noted several times that Plaintiff's "psychological treatment notes during the period at issue indicated the claimant's mental status was within normal limits" and that his GAF scores indicated only moderate to mild symptoms.  (*See id.* at 20, 23-24)  Moreover, because the ALJ noted that Plaintiff's daily living activities consisted in part of talking to others about his ADHD (*see id.* at 23), it was not unreasonable for the ALJ to exclude social functioning limitations from his RFC, to the extent they go beyond those captured by the ALJ's express requirement of low-stress jobs.

Guinn further argues that the ALJ misinterpreted or misunderstood Dr. Chester's findings with respect to his tangential and perseverative thought process because the ALJ referenced these findings in minimizing the severity of Guinn's functional limitations.  The Court disagrees with Plaintiff's interpretation of the ALJ's discussion of the tangential and perseverative thought

---

[3]Indeed, in concluding that Plaintiff had moderate difficulties with concentration, persistence, or pace, the ALJ credited Plaintiff's own testimony that "he had a poor ability to follow written and spoken instructions." (*Id.* at 20)

process. The ALJ expressly cited Plaintiff's tangential and perseverative thought process in support of his finding of "severe psychological impairments." (*Id.* at 24) Rather than in decreasing the severity of Plaintiff's difficulties in concentration, persistence, or pace, the ALJ appears to have referred to the tangential and perseverative thought process in finding moderate difficulties in this realm *despite* the facts that Plaintiff's "mental status was within normal limits" at all relevant times and that Plaintiff was able to prepare meals, do some cleaning, go outside, drive, walk, or use public transportation. (*See id.* at 20) Similarly, the ALJ's reference to Plaintiff's tangential and perseverative thought process in explaining why the ALJ concluded "the evidence of record does not support the level of functional limitations alleged by the claimant" does not suggest that the ALJ believed these issues minimized Plaintiff's situation; rather, the ALJ thoroughly summarized the medical evidence and found that, based on the record as a whole, Plaintiff overstated the severity of the functional limitations caused by his ADHD and depression. (*See id.* at 22-23) Particularly in light of Dr. Chester's provisional diagnosis of "malingering" (*id.* at 399) and Dr. Ayoola's observation that Plaintiff may have intentionally refused to tie his shoelaces when asked (*id.* at 391), there is substantial evidence to support the ALJ's conclusion. In short, there is substantial evidence to support the ALJ's analysis of Dr. Chester's report.

## V.   CONCLUSION

For the reasons given above, the Court will grant Defendant's motion for summary judgment and deny Plaintiff's motion for summary judgment. An appropriate Order follows.